UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
DONNA FINNIGAN,                          :        CV: 20-2837

                    Plaintiff,           :        COMPLAINT

         -against-                       :        Jury Trial Demanded

MATTITUCK-CUTCHOGUE                       :
UNION FREE SCHOOL                         :
DISTRICT, JILL GIERASCH,                  :
DR. KATHLEEN DEVINE &                     :
RANDALL SOLOMON, MD                       :
(sued in Their individual capacities     :
Pursuant to 42 U.S.C. §1983 &            :
NYEL),                                    :
                                          :
                    Defendants.          :
-----------------------------------------------X

        DONNA FINNIGAN ("Plaintiff") by and through his attorneys, SCOTT MICHAEL

MISHKIN, P.C., brings this action against MATTITUCK-CUTCHOGUE UNION FREE

SCHOOL DISTRICT, JILL GIERASCH, DR. KATHLEEN DEVINE & RANDALL

("Collectively Defendants") and respectfully alleges as follows:

                        **PRELIMINARY STATEMENT**

        This case is brought under the Americans with Disabilities Act of 1990 ("ADA"), as

amended 42 U.S.C. §§ 12101 et. seq. for disability and perceived disability discrimination

against plaintiff by Mattituck-Cutchogue Union Free School District ((District);

42 U.S.C. § 1983 Substantive Due Process Rights as plaintiff was subjected to invidious

(selective enforcement) discrimination at the hands of District and individual defendants, that

were carried out with malicious and bad faith intent to injure plaintiff;  and New York Executive

Law §290 et seq. (NYEL) against the District and all individual defendants for their

discriminatory treatment of plaintiff due to her record of disability and perceived disability.

                                    1

## JURISDICTION

FIRST:     The jurisdiction of the Court over this controversy is based upon ADA as amended 42 U.S.C. §§ 12101 *et. seq;* 42 U.S.C. § 1983.

SECOND:     The Court also has supplemental jurisdiction over this case pursuant to 28 U.S.C. §1367(a), as plaintiff's NYEL claims form part of the same case and controversy.

THIRD:     Therefore, this court has proper jurisdiction in this action.

## VENUE

FOURTH:     The unlawful practices alleged below were committed within the County of Suffolk, State of New York.

FIFTH:     At the time of the unlawful practices, plaintiff was, and still is, a resident of Suffolk County in the State of New York.

SIXTH:     The causes of action arose in the State of New York while plaintiff was employed by the District who conducts substantial business in the County of Suffolk, City of Cutchogue, in the State of New York.

SEVENTH:     Therefore, this Court is the proper venue under 28 U.S.C. §1391.

## PARTIES

EIGHTH:     At all times relevant to this action, plaintiff was an employee of the District as defined by ADA and NYEL.

NINTH:     At all times relevant to this action, the District was an employer as defined by the ADA and NYEL.

TENTH:     At all times relevant to this action, plaintiff more than satisfactorily performed all of the essential functions of her position that were required of her at the District.

ELEVENTH: The District is a public school district located on the North Fork of Long Island, in Suffolk County and is a municipal corporation duly organized, authorized and existing under and by the virtue of the laws of the State of New York, with offices located at 385 Depot Lane, Cutchogue, New York 11935.

TWELFTH: All of the individually named Defendants are employed by the District.

THIRTEENTH: The Discrimination against plaintiff occurred and continues to occur at the District's East Elementary School located at 34900 Main Road, Cutchogue.

FOURTEENTH: At all times relevant to this action, Jill M. Gierasch (Gierasch), was and remains the District's Superintendent of Schools.

FIFTEENTH: Gierasch had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment and adverse actions against plaintiff due to her record of diagnosed disability and perceived disability.

SIXTEENTH: At all times relevant to this action, Gierasch while acting under color of state law, injured plaintiff thus giving rise to plaintiff's §1983 cause of action by depriving plaintiff of her constitutionally protected rights in violation § 1983.

SEVENTEENTH: Specifically, the District and Gierasch violated plaintiff's substantive due process rights guaranteed under the § 1983.

EIGHTEENTH: The District and Gierasch took malicious affirmative acts against plaintiff and said bad faith intentional affirmative acts were so egregious and so outrageous that it shocks the contemporary conscience.

NINETEENTH: The District and Gierasch treated plaintiff differently from other similarly situated employees at the District and such differential treatment was based on

3

impermissible consideration and was motivated to punish and with malicious bad faith intent to cause harm to plaintiff.

TWENTY: Gierasch directly participated and was personally involved in the constitutional violations alleged below and showed a deliberate indifference towards plaintiff and was the direct cause of her injury and never submitted plaintiff's similarly situated co-workers to the same malicious and bath faith actions.

TWENTY FIRST: Gierasch, while acting under color of State law, in a supervisory position, willfully and with the intent to cause plaintiff mental harm, personally deprived plaintiff of her constitutionally protected substantive due process rights by causing plaintiff's harm, due to her record of diagnosed disability and perceived disability.

TWENTY SECOND: Gierasch, as alleged below, was personally involved in the malicious and willful intent to cause and did cause plaintiff mental harm, thus depriving plaintiff of her substantive due process rights and is therefore personally liable pursuant to 42 U.S.C. §1983.

TWENTY THIRD: Gierasch knew or should have known that her and the District's ongoing willful and malicious actions against plaintiff violated clearly established Constitutional and statutory rights of which a reasonable person would be aware, that is she knew she violated plaintiff's substantive due process rights.

TWENTY FOURTH: Gierasch, acting under color of state law, acted with the understanding that her actions violated clearly established legal statutory rights of plaintiff and therefore waived her qualified immunity.

TWENTY FIFTH: Gierasch acting under color of state law, aided, abetted, incited, controlled, compelled, and/or coerced the acts against plaintiff that are forbidden under NYEL.

4

TWENTY SIXTH:    Gierasch actually participated in the conduct giving rise to plaintiff's discrimination claims and is thereby individually liable for her willful, wanton and malicious discriminatory and adverse treatment against plaintiff and therefore waived her qualified immunity.

TWENTY SEVENTH:       Gierasch, is named in her individual capacity because, while acting under color of state law, knew, or should have known, that her ongoing/continuous willful and malicious actions against plaintiff violated her clearly established statutory rights, of which a reasonable person would have known that plaintiff's rights were being violated and therefore has waived her qualified immunity.

TWENTY EIGHTH:  Gierasch actually participated in the conduct giving rise to plaintiff's discrimination claims and is thereby individually liable for her willful, wanton and malicious discriminatory and adverse treatment against plaintiff and therefore is liable pursuant to NYEL and has waived her qualified immunity.

TWENTY NINETH:  The contour of plaintiff's right not to be discriminated against due to her disability and her perceived disability and not be treated adversely as compared to her similarly situated co-workers, is sufficiently clear that a reasonable individual, such as Gierasch should have known that her actions violated plaintiff's rights under the NYEL.

THIRTY:       Gierasch, acting under color of state law, arbitrarily, selectively and with malicious intent discriminated against plaintiff based on her disability as well as perceived disability.

THIRTY FIRST:       Therefore, Gierasch is individually liable for her discrimination as for and against plaintiff under the NYEL.

THIRTY SECOND:   Randall Solomon, (Solomon), is a psychiatry specialist

5

and was an agent of the District at the time of the unlawful practices.

THIRTY FOURTH:   Solomon controlled plaintiff's terms, conditions and privileges of her employment and qualifies as agent of the District pursuant to NYEL.

THIRTY FIFTH:     Solomon aided and abetted in the discrimination against plaintiff and participated in the decision-making process that forms the basis of the discrimination against plaintiff and was therefore an agent of the District and is individually liable pursuant to NYEL.

THIRTY SIXTH:     Solomon is liable for the discrimination as for and against plaintiff as he actually participated in the discriminatory conduct against plaintiff.

THIRTY SEVENTH:       Solomon is individually liable for the discrimination as for and against plaintiff as he actually participated in the discriminatory conduct with Gierasch.

THIRTY EIGHTH:   Solomon as an agent for the District, acted under color of state law, with the understanding that his actions violated clearly established legal statutory rights of plaintiff.

THIRTY NINETH:   Solomon as an agent of the District, acted under color of state law, aided, abetted, incited, controlled, compelled, and/or coerced the acts against plaintiff that are forbidden under NYEL.

FORTY:       Solomon as agent of the District,, is named in his individual capacity because, while acting under color of state law, knew, or should have known, that his ongoing/continuous willful and malicious actions against plaintiff violated her clearly established statutory rights, of which a reasonable person would have known that plaintiff's rights were being violated and therefore has waived his qualified immunity.

FORTY FIRST:     Solomon, as an agent for the District, actually participated in the conduct giving rise to plaintiff's discrimination claims and is thereby individually liable for his willful, wanton and malicious discriminatory and adverse treatment against plaintiff and therefore is liable pursuant to NYEL and has waived his qualified immunity.

FORTY SECOND:     At all times relevant to this action, Dr. Kathleen Devine (Devine), was and remains the District's Principal at its Cutchogue East Elementary School.

FORTY THIRD:     Devine had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment and adverse actions against plaintiff due to her record of diagnosed disability and perceived disability.

FORTY FOURTH:     At all times relevant to this action, Devine while acting under color of state law, injured plaintiff thus giving rise to plaintiff's §1983 cause of action by depriving plaintiff of her constitutionally protected rights in violation § 1983.

FORTY FIFTH:     Devine deprived plaintiff of her constitutionally protected rights and are therefore violated § 1983.

FORTY SIXTH:     Specifically, Devine violated plaintiff's substantive due process rights guaranteed under the § 1983.

FORTY SEVENTH:   Devine took malicious affirmative acts against plaintiff and said bad faith intentional affirmative acts were so egregious and so outrageous that it shocks the contemporary conscience.

FORTY EIGHTH:     Devine treated plaintiff differently from other similarly situated teachers at the District and such differential treatment was based on impermissible consideration and was motivated to punish and with malicious bad faith intent to cause harm to plaintiff.

FORTY NINETH:     Devine directly participated and was personally involved in the constitutional violations alleged below and showed a deliberate indifference towards plaintiff and was the direct cause of her injury and never submitted plaintiff's similarly situated co-workers to the same malicious and bath faith actions.

FIFTY:     Devine, while acting under color of State law, in a supervisory position, willfully and with the intent to cause plaintiff mental harm, personally deprived plaintiff of her constitutionally protected substantive due process rights by causing plaintiff's harm, due to her record of diagnosed disability and perceived disability.

FIFTY FIRST:     Devine, as alleged below, was personally involved in the malicious and willful intent to cause and did plaintiff mental harm, thus depriving plaintiff of her substantive due process rights and is therefore personally liable pursuant to 42 U.S.C. §1983.

FIFTY SECOND:     Devine knew or should have known that her and the District's ongoing willful and malicious actions against plaintiff violated clearly established constitutional and statutory rights of which a reasonable person would be aware, that is she knew she violated plaintiff's substantive due process rights.

FIFTY THIRD:     Devine acting under color of state law, acted with the understanding that her actions violated clearly established legal statutory rights of plaintiff and therefore waived her qualified immunity.

FIFTY FOURTH:     Devine acting under color of state law, aided, abetted, incited, controlled, compelled, and/or coerced the acts against plaintiff that are forbidden under NYEL.

FIFTY FIFTH:     Devine actually participated in the conduct giving rise to plaintiff's discrimination claims and is thereby individually liable for her willful, wanton and malicious

discriminatory and adverse treatment against plaintiff and therefore waived her qualified immunity.

FIFTY SIXTH:     Devine, is named in her individual capacity because, while acting under color of state law, knew, or should have known, that her ongoing/continuous willful and malicious actions against plaintiff violated her clearly established statutory rights, of which a reasonable person would have known that plaintiff's rights were being violated and therefore has waived her qualified immunity.

FIFTY SEVENTH:   Devine actually participated in the conduct giving rise to plaintiff's discrimination claims and is thereby individually liable for her willful, wanton and malicious discriminatory and adverse treatment against plaintiff and therefore is liable pursuant to NYEL and has waived her qualified immunity.

FIFTY EIGHTH:     The contour of plaintiff's right not to be discriminated against due to her disability and not be treated adversely as compared to her similarly situated co-workers, is sufficiently clear that a reasonable individual, such as Devine should have known that her actions violated plaintiff's rights under the NYEL.

FIFTY NINETH:     Devine, acting under color of state law, arbitrarily, selectively and with malicious intent discriminated against plaintiff based on her disability as well as perceived disability.

SIXTY:     Therefore, Devine is individually liable for her discrimination as for and against plaintiff under the NYEL.

# FACTS

SIXTY FIRST:    Plaintiff began her highly dedicated career at the District in the position of fifth grade teacher on September 1, 1998.

SIXTY SECOND:    On or about September 2003, plaintiff began teaching fourth grade and did so until the Spring of 2018, when due to defendants' knowledge of her diagnosed disability of multiple sclerosis (MS) and due to her perceived mental disability, suffered the adverse employment action of being removed her from her fourth grade classroom and fourth grade teaching duties and assigned the diminished less distinguished title and duties of a math support person.

SIXTY THIRD:    During the 2017-2018, school year, JT was a student in plaintiff's fourth grade classroom, along with thirteen girls and seven boys.

SIXTY FOURTH:    It was known to the District that JT was considered to have a bad reputation due to his consistent inappropriate behavior.

SIXTY FIFTH:    Despite the District's, Devine's and Gierasch's knowledge and their failure to take remedial measures pertaining to JT's inappropriate behavior, in September 2017, JT's inappropriate behavior rose to the level of bullying which included pulling down the pants of one of his classmates, calling out during class, interrupting other students in the class, and calling various students names such as calling the girls "pussies" and another male student a "faggot."

SIXTY SIXTH:    When plaintiff met with Gierasch and Devine pertaining to JT's calling another male student a "faggot," Devine stated that the incident was unfounded, even though JT admitted to it.

SIXTY SEVENTH:    As JT's inappropriate behavior continued, due to the District's failure to take appropriate remedial measures, in March 2018, plaintiff met with Devine concerning JT not conforming to classroom rules and his aggressive behavior towards his classmates.

SIXTY EIGHTH: In response to plaintiff's complaint, Devine aksed plaintiff if she could just get through the rest of the year without addressing JT's behavioral issues.

SIXTY NINETH:    Plaintiff, in the best interest of the District's students, advised Devine she felt it was her responsibility to continue to work on correcting his behavior so that he could advance to fifth grade while reducing his behavioral issues towards the other students in her classroom.

SEVENTY:    Devine did not care about plaintiff's concerns and request for help to remedy JT's on-going behavioral issues in her classroom and left plaintiff to deal with JT's ongoing behavioral issues in her classroom by herself.

SEVENTY FIRST:    In April 2018, plaintiff formally complained to Devine that JT cheated on the formal math assessment test using the computer-based STAR program, when he Googled the answers during the test.

SEVENTY SECOND:    Once again, Devine willfully refused to take any remedial towards JT, and instead blamed the other teacher in the room and plaintiff for not monitoring the class better.

SEVENTY THIRD:    On April 24, 2018, as part of her position responsibilities and pursuant to Devine's direction, to keep JT's Mother informed about JT's behavior on a regular basis, plaintiff contacted JT's parents and requested a meeting with them and JT to discuss JT's

unremedied behavioral issues moving forward for the remainder of the school year as well as for the year ahead.

SEVENTY FOURTH: JT, his Mother and plaintiff met that same afternoon.

SEVENTY FIFTH: Plaintiff advised JT's Mother about many of JT's good qualities before her raising concerns regarding his ongoing disruptive behavioral issues towards his classmates and other students at the District.

SEVENTY SIXTH: Plaintiff presented JT's Mother with examples of various courses of remedy she had taken throughout the year in ongoing attempts to correct JT's inappropriate behavior towards his classmates and others.

SEVENTY SEVENTH: Plaintiff discussed JT calling another male student a "faggot" and calling the girls in plaintiff's classroom "pussies" and making obscene gestures at each of them and that she handled that situations with JT by having a serious conversation with him and giving him recess detention (sitting in the gazebo during recess time).

SEVENTY EIGHTH: JT's Mother's response to JT was that "pussy" is not a nice word.

SEVENTY NINETH: Plaintiff also advised JT's Mother that on or about the beginning of April 2018, JT was repeatedly slapping the girls in the classroom on their foreheads telling them that he was saying "hello" Egyptian style and that the girls were extremely upset and that they individually asked him repeatedly stop.

EIGHTY: Plaintiff advised JT' Mother that she had a conversation with him reminding him of people's personal space, keeping one's hands to themselves and stopping such inappropriate behavior, despite being asked numerous times to do so.

EIGHTY FIRST:     Plaintiff was engaging in this corrective measure meeting with JT and his Mother, as the District ignored plaintiff's request for help in regard to JT's behavior.

EIGHTY SECOND:     Plaintiff advised JT's Mother that since JT insisted that he was just saying "hello," that she asked him if the girls in the classroom could say "hello" back to him "Egyptian-style" and he agreed and that although this may have seemed like an unusual response to JT's behavior, without the guidance from the District, Devine, or Gierasch, plaintiff was running out of strategies.

EIGHTY THIRD:     Plaintiff also explained to JT's Mother the word "respect" was the word for the month of April 2018, and that when having a class discussion about respect, a student mentioned that they felt that someone in the class didn't respect the others in the class.

EIGHTY FOURTH:     Plaintiff advised JT's Mother that she told her students that if they wanted to share their feelings, that they had to do so in a guided manner and outlined for them that they had to state something positive about JT before they expressed how they felt because of JT's inappropriate/bullying behavior towards them and that she also told JT that what he heard might be difficult to hear, but that perhaps he would finally realize the impact of his inappropriate actions toward his peers.

EIGHTY FIFTH:     Plaintiff believed this was a reasonable approach due to the District and Devine taking no action to stop JT's ongoing inappropriate behavior towards his classmates and other students at the District.

EIGHTY SIXTH:     Plaintiff advised JT's Mother that she was extremely proud of her students and JT as they all handled themselves in a proper and mature manner and that her sincerest hope was that perhaps this meeting would have a positive impact and outcome for JT as well.

EIGHTY SEVENTH:      Plaintiff goal, as it has been throughout her entire career at the District, was the best interest of the students first.

EIGHTY EIGHTH:    Plaintiff also explained to JT's Mother that she had to move JT's desk out of all the groups because almost all of the nineteen students in the classroom had asked not to sit with or by him due to his behavior towards them.

EIGHTY NINETH:    JT'S Mother asked plaintiff what else she suggested to try and help JT behave properly, to which plaintiff suggested to coordinate a discipline plan, but JT's Mother did not offer any suggestions. JT's Mother had no concerns and actually thanked plaintiff for working with JT.

NINETY:      On May 9. 2018, JT's parents met with Devine to discuss JT's Mother's meeting with plaintiff and their good faith sound effort to work toward correcting JT's ongoing inappropriate behavior towards other students.

NINETY FIRST:      On May 11, 2018, Devine met with plaintiff to discuss her meeting with JT's parents and reiterated much of what plaintiff had shared with JT's Mother and JT at their recent meeting, where JT's Mother had no concerns and actually thanked plaintiff for working with JT and even asked plaintiff for suggestions on how to correct JT's behavior.

NINETY SECOND:    Devine stated that JT's parents wanted a follow-up meeting with plaintiff, however, by telephone only.

NINETY THIRD:      Approximately one week later, Devine told plaintiff that their meeting had to be documented and that plaintiff would be meeting with her and Dr. Smith, (the District's then Superintendent) after school that day and was advised to bring union representation with her.

NINETY FOURTH:   At the start of the meeting, a memo dated May 11, 2018, was given to plaintiff that outlined much of the same information that had been shared with JT's parents and then discussed with Devine.

NINETY FIFTH:      Dr. Smith asked plaintiff if she would have done things differently in trying to correct JT's behavioral issues and she said she would not have if the District continued its lack of support in correcting JT's behavioral issues.

NINETY SIXTH:      Dr. Smith then requested another meeting with Devine to clear up some fabricated misunderstanding that JT had complained first and then his parents.

NIENTY SEVENTH:         Dr. Smith also suggested that another meeting be held with the JT's parents to clear up any further miscommunication.

NINETY EIGHTH:    Plaintiff was also told that after she met with JT's parents, she would be asked to sign an updated memo to be placed in her personnel file.

NINETY NINETH:    Dr. Smith then told plaintiff that the District purposely placed JT in her classroom because she was successful in reaching students like him and also said that when asked, JT's parents did not want JT removed from her classroom.

ONE HUNDRED:     Dr. Smith asked plaintiff if she wanted JT removed from her class and plaintiff said definitely not and that she liked JT but that didn't mean she was going to permit JT's disruptive behavior in the classroom to continue due to the lack of support from the District throughout the year.

ONE HUNDRED FIRST;    The following week, plaintiff e-mailed Dr. Smith and asked him when the meeting with JT's parents would occur.  His response was that he never said there would be another meeting and that plaintiff would not attend if there was a meeting.

ONE HUNDRED SECOND: Plaintiff then met again with Devine and Shawn Petretti, (Petretti), the District's High School Principal, who told plaintiff that he was filling in for Dr. Smith because she was unable to attend.

ONE HUNDRED THIRD: Petretti told plaintiff that she needed to sign a revised memo that would be placed in her file.

ONE HUNDRED FOURTH: The initial memo stated that the girls "tapped" JT's forehead and the revised memo stated that plaintiff allowed the girls to "strike" JT's forehead.

ONE HUNDRED FIFTH: However, the language used to state that JT "tapped" the girls' foreheads remained.

ONE HUNDRED SIXTH: Plaintiff refused to sign the memo, as Devine purposefully attempted to cause harm to plaintiff's career.

ONE HUNDRED SEVENTH: Petretti told Devine to change the language back to the original verbiage and told plaintiff that the District's attorney said that the least the District could do was place a letter in her file suggesting that the District could take stronger action if they wanted to.

ONE HUNDRED EIGHTH: It was decided the memo would go into plaintiff's file unsigned and her response would be attached to the memo which she would then sign.

ONE HUNDRED NINETH: There was no time frame put on when that would happen.

ONE HUNDRED ELEVENTH: Plaintiff subsequently (June 21, 2018) wrote up her response to the District's pretextual memo that was placed in her unblemished file, typed up a cover letter to JT's parents and sent them a copy of her response to take the place of the meeting with them but never occurred.

ONE HUNDRED TWELVE:     The District's lack of corrective action towards JT, which permitted him to engage in his violations of District student code of conduct, resulted in a May 2018, incident when during a Birds of Prey demonstration in the District's school library, JT scared the birds to the point that they had to be put back in their cages and then played with their feathers that were floating through the air.

ONE HUNDRED THIRTEENTH:     Once again, JT was not disciplined but instead Devine reprimanded the substitute teacher, the science teacher who set up the program, and the library aide who was in the library during that presentation.

ONE HUNDRED FIFTEENTH:     Devine subsequently told plaintiff to inform JT's Mother about his behavioral issues on a regular basis, which plaintiff did through various e-mails throughout the next few weeks.

ONE HUNDRED SIXTEENTH:     Due to the District's lack of corrective action towards JT, he misbehaved in math class and was sent back to the back of the classroom for interfering in the lesson.

ONE HUNDRED SEVENTEENTH:     When plaintiff brought JT's behavior in the math class to the attention of Devine, once again, JT was not subjected to any corrective action.

ONE HUNDRED EIGHTHEETH:     In early June 2018, JT misrepresented to plaintiff on two consecutive days about completing classwork.

ONE HUNDRED NINETEENTH:     As a result, plaintiff sent him to the District's front office to complete the work.  However, he immediately appeared back in plaintiff's classroom.

ONE HUNDRED TWENTY:     As normal course of procedure, as for and in regard to plaintiff's similarly situated co-workers, plaintiff sat JT in the hallway to complete the work.

ONE HUNDRED TWENTY FIRST: Devine then told plaintiff that JT was not permitted to sit in the hallway for that purpose, despite plaintiff's similarly situated teachers placing their students routinely in the hallway to complete unfinished work without any discussion.

ONE HUNDRED TWENTY SECOND: On August 3, 2018, plaintiff received a letter from Gierasch, indicating that she wanted to meet to discuss the contents of plaintiff's letter she mailed to the JT's parents on June 21, 2018.

ONE HUNDRED TWENTY THIRD: On or about August 7, 2018, plaintiff met with Gierasch, Devine and her representative Frank Massa.

ONE HUNDRED TWENTY FOURTH: Gierasch had a copy of the letter, JT's report card, and plaintiff's notebook.

ONE HUNDRED TWENTY FIFTH: Gierasch admonished plaintiff for referring to JT as a bully, despite the District's knowledge of JT's record of bullying students and that the District refused to take any remedial measures to stop JT's behavior and that he met the definition of a bully as written in the District's Code of Conduct Section 5300 that defined bullying as repeated attempts to ridicule, intimidate and/or humiliate.

ONE HUNDRED TWENTY SIXTH: Gierasch asked plaintiff if she sent the letter to have "the last word," to which plaintiff responded that that idea had never crossed her mind as she always had during her twenty-one year career and continues to have the best interest of District's students.

ONE HUNDRED TWENTY SEVENTH Plaintiff respectfully advised Gierasch that her reasonable purpose was to be sure JT's parents understood her position with regard to their

son since she never had the opportunity to meet with them again after their conference with Devine.

ONE HUNDRED TWENTY EIGHTH:     Gierasch made an irrelevant reference to whether or not plaintiff had children and that she did not indicate anything on JT's report card to reference having his behavior problems within the classroom.

ONE HUNDRED TWENTY NINETH:     In the social and emotional development section of the report card plaintiff rated JT "S" or "M" to represent "some of the time" or "most of the time," and advised Gierasch that she focused on the positive behavior he displayed in class but never gave the highest grade of "C" for "consistent."

ONE HUNDRED THIRTY:  Throughout the entire ninety-minute meeting Gierasch attacked plaintiff judgment, despite plaintiff's ongoing complaints and request for help to Devine, which went ignored, leaving plaintiff to work with JT to cure his behavior towards students.

ONE HUNDRED THIRTY FIRST   When that meeting ended, Gierasch told plaintiff she was not to talk to JT's parents in any manner, including "in the supermarket" and asked if she understood and told Devine that she was to check on plaintiff frequently.

ONE HUNDRED THIRY SECOND:     Upon information and belief, Gierasch did not tell Devine to check on plaintiff's similarly situated co-workers frequently.

ONE HUNDRED THIRTY THIRD:     Gierasch told plaintiff that she was not allowed to discuss JT and/or his history with anyone unless a District Administrator was present and that plaintiff should also let a District Administrator know when she was sending an e-mail to any parent of any new student if it pertained to behavior.

ONE HUNDRED THIRY FOURTH:    Upon information and belief, Gierasch did not tell any of plaintiff's similarly situated co-workers to let a District Administrator know when they were sending an e-mail to any parent of any new student if it pertained to behavior.

ONE HUNDRED THIRTY FIFTH:  Then, on August 16, 2018, in direct act of perceived mental disability discrimination and due to her record of the diagnosed disability of MS, the District, at the recommendation of Gierasch, passed a resolution requiring plaintiff to undergo a Section 913 psychiatric evaluation, with the Solomon on September 20, 2018.

ONE HUNDRED THIRTY SIXTH:    In act of adverse employment action, which occurred under circumstances giving rise to an inference discrimination based on her diagnosed disability and perceived disability, Gierasch's materially adversely changed the terms and conditions of plaintiff's employment by directing plaintiff on immediate home assignment (inactive status) and disabled her District e-mail account as well as access to her school files.

ONE HUNDRED THIRTY SEVENTH:    Gierasch's adverse employment actions against plaintiff clearly demonstrated discrimination against plaintiff due to a perceived disability of mental illness.

ONE HUNDRED THIRTY EIGHTH:    To further demonstrate the District's, Gierasch's and Solomon's discrimination and adverse action against plaintiff, on August 17, 2018, and August 20, 2018, Gierasch communicated directly with Solomon and to confirm his diagnoses that plaintiff has a mental disability of psychological difficulties and a neurodegenerative illness that affected her ability to teach fourth grade and the safety of the District's students.

ONE HUNDRED THIRTY NINETH:    Gierasch's further adverse employment action against plaintiff included her providing Solomon and Solomon accepting, fabricated

documentation motivated with discriminatory intent to aid Solomon with his pre-arranged pretextual non confirmed diagnosis that plaintiff be subjected to mental treatment due to a perceived disability of neurodegenerative illness.

ONE HUNDRED FORTY:    And to further demonstrate Gierasch's malicious motive, the fabricated documentation she provided to Solomon and Solomon used for his pre-arranged diagnosis of plaintiff, was written by Gierasch in all capital letters, emphasizing the diagnosis she wanted Solomon and Solomon agreed to determine, and did so, after meeting with plaintiff on September 20, 2018.

ONE HUNDRED FORTY FIRST:    Further demonstrating the District's, Gierasch's and Solomon's adverse employment actions against plaintiff, Gierasch also gave Solomon and he accepted, plaintiff's unsigned May 11, 2018, counseling memo created by Devine, to which Solomon used for his pre-arranged diagnoses of plaintiff.

ONE HUNDRED FORTY SECOND:        The District's and Gierasch's further adverse employment action against plaintiff occurred when plaintiff was directed to remove all her personal items from her fourth grade classroom prior to the start of the school year, which was Thursday, August 29, 2018, which in and of itself demonstrates pretext that Gierasch and the District had already decided to remove plaintiff from her fourth classroom and teaching position, knowing what Solomon's diagnosis and recommendation was going to be even before his September 20, 2018, meeting with plaintiff.

ONE HUNDRED FORTY THIRD:    Gierasch's adverse employment action of plaintiff's less distinguished title and demotion, confirms that she already knew what Solomon's perceived mental diagnosis of plaintiff was going to be, as they worked together and pre-arranged same, even before Solomon ever met with plaintiff.

ONE HUNDRED FORTY FOURTH:          At the August 29, September 10,18, and

November 15, 2018, District Board of Education (BOE) meetings, parents and former students

spoke on plaintiff's behalf and signed a petition with over five hundred signatures for plaintiff's

return to work at fourth grade teacher and many of her former students wrote supportive letters

that were submitted to the District's BOE as well.

ONE HUNDRED FORTY FIFTH:    In a further demonstration of the District's pretext,

there was no mention in the official minutes of any the individuals who spoke at these BOE

meetings or submitted letters on plaintiff's behalf.

ONE HUNDRED FORTY SIXTH:    As per the District's, Gierasch's and Solomon's

pretext, plaintiff met with Solomon on September 20, 2018, for her (purported neutral)

discriminatory psychiatric evaluation.

ONE HUNDRED FORTY SEVENTH:  Solomon told plaintiff that his examination of

her did not create a doctor patient privilege, that it was not confidential and his findings would be

given to Gierasch and that the information he gave to him would be used in disciplinary and/or

other administrative proceedings against her and then wrote at the end of his discriminatory

report, that plaintiff was guarded in her responses and thus may have a mental illness.

ONE HUNDRED FORTY EIGHTH: And at the conclusion of plaintiff's purported

neutral psychiatric evaluation, on September 20, 2018, Solomon telephoned and spoke with

Gierasch, about his meeting with plaintiff.

ONE HUNDRED FORTY NINETH:          On October 10, 2018, Gierasch sent plaintiff

Solomon's written creation.

ONE HUNDRED FIFTY:    Based on Gierash's prior written and verbal

communications with Solomon, including the rare occasion that plaintiff used a cane, (Solomon,

as agreed, reported that plaintiff may have additional medical and/or neurological difficulties that are germane and that she may have neurodegenerative disease.

ONE HUNDRED FIFTY FIRST:     Then Solomon took the further adverse employment action and stated that due to plaintiff's neurodegenerative disease, she was experiencing subtle cognitive changes which occurred with neurodegenerative disease and that her changes can negatively impact her ability to consistently exercise good judgment, develop appropriate insight and process empathically derived information.

ONE HUNDRED FIFTY SECOND:  It is clear that a reasonable professional such as Solomon could not have made such a career harming diagnosis after meeting with a person for forty-five minutes.

ONE HUNDRED FIFTY THIRD:     As plaintiff was never diagnosed with a neurodegenerative disease, Solomon's and Gierasch's pre text of discrimination based on a perceived disability as for and against plaintiff was now in writing.

ONE HUNDRED FIFTY FOURTH:          And to seal the deal for the District and Gierasch, (recall Gierasch had already removed plaintiff from her fourth grade classroom, even before plaintiff met with Solomon), Solomon, with no previous diagnoses what so ever, wrote that plaintiff was at an unacceptably high risk that she would continue to behave in an unsafe and maladaptive manner at the District (with no history or diagnoses of mental illness), and that mental health treatment may substantially improve plaintiff's psychological difficulties which underlie the problems she has experienced in the workplace, (which she had none during her entire twenty one year career) and that it would take at least two to four months to establish a documented record of improvement (when at no time what so ever, was plaintiff ever diagnosed with psychological difficulties) and directed plaintiff receive twelve to sixteen sessions with a

psychiatrist or psychologist with a least eight sessions completed as a mandated stipulation before plaintiff returned to the classroom.

ONE HUNDRED FIFTY FIFTH: Working together, Solomon's and Gierasch's adverse actions as for and against plaintiff were carried out with the malicious intent to cause harm to plaintiff's career and personal life.

ONE HUNDRED FIFTY SIXTH:     And based on Gierasch's written and verbal communications with Solomon before his meeting with plaintiff on September 20, 2018, Solomon followed through with his adverse employment action and recommended plaintiff's immediate removal from her fourth grade classroom (Gierash already removed her from her classroom, knowing this would be Solomon's recommendation) to ensure the safety of District's school environment.

ONE HUNDRED FIFTY SEVENTH:      So now according to Solomon and Gierasch plaintiff, with an unblemished highly decorated career at the District, was suddenly a safety issue for the entire school environment.

ONE HUNDRED FIFTY EIGHTH:  Both Gierasch and Solomon knew the key words to have plaintiff remained removed from her fourth grade classroom and her fourth grade teaching position were "safety issue for the entire school environment."

ONE HUNDRED FIFTY NINETH:  Gierasch and Solomon carried out their pretext in bad faith, animus and motivated by discriminatory intent to purposefully cause harm to plaintiff's career at the District.

ONE HUNDRED SIXTY:     As a result of the District's, Gierasch and Solomon's adverse employment action against plaintiff, she was removed from her title as fourth grade teacher, her classroom was not given back to her and she returned to the District on November

13, 2018, in the less distinguished title of a math support person and remains in the less distinguished title and remained in this less distinguished title until September 2019, when she was placed back in her fourth grade classroom and resumed her fourth grade teaching duties.

ONE HUNDRED SIXTY FIRST:    When plaintiff returned to work her desk had been moved into a shared classroom in the second-grade hallway and facing a wall.

ONE HUNDRED SIXTY THIRD:    Plaintiff's similarly situated co-workers were never subjected to these type of working conditions.

ONE HUNDRED SIXTY FOURTH:    When the District's School Librarian was causing student anguish during her lessons and the classroom teachers complained to the District's Administrators, the Librarian was directed not to have contact with the students for the remainder of the year.

ONE HUNDRED SIXTY FIFTH:    When the Librarian continued to interact with students, the District, did not pass a resolution requiring her to undergo a Section 913 psychiatric evaluation, with the Solomon, as it did with plaintiff.

ONE HUNDRED SIXTY SIXTH:    In addition, plaintiff was given a different computer other than the one that was in her fourth grade classroom that had to be set up and the electronic pass she was given to enter the building didn't work and she was not able to receive e-mails and most of her materials were still in the classroom that was taken away from her.

ONE HUNDRED SIXTY SEVENTH:    Based on the totality of circumstances it is more likely than not defendants' adverse employment actions against plaintiff, including but not limited to taking away title and position and giving her a less distinguished title were based on her diagnosed disability of MS and a perceived mental disability.

ONE HUNDRED SIXTY EIGHTH: Plaintiff was a member of a protected class, who performed her job satisfactorily for her entire career, and suffered an adverse employment action under circumstances giving rise to an inference of discrimination.

ONE HUNDRED SIXTY NINETH: At no time did defendants' articulate a legitimate, non-discriminatory reason for its adverse employment action of working together with Solomon which resulted in a materially adverse change in the terms and conditions of plaintiff's employment.

ONE HUNDRED SEVENTY:      Based on the totality of circumstances a reasonable jury could conclude that more likely than not defendants' actions were motivated, by discriminatory reasons.

ONE HUNDRED SEVENTY FIRST:      Plaintiff has filed this instant action within ninety days of receiving her Notice of Right To Sue Letter from the Equal Employment Opportunity Commission.

**WHEREFORE**, plaintiff demands judgment against defendants as follows:

1.      For all damages recoverable as a matter of law pursuant to 42 U.S.C. § 1983 for the District's violations of plaintiff's substantive due process rights, including but not limited to actual, compensatory, emotional and punitive damages to be determined by a Jury;

2.      For all damages recoverable as a matter of law against Gierasch in her individual capacity, pursuant to 42 U.S.C. § 1983, for her violations of plaintiff's substantive due process rights including but not limited to actual, compensatory, emotional and punitive damages to be determined by a Jury;

3.      For all damages recoverable as a matter of law against Devine in her individual

capacity, pursuant to 42 U.S.C. § 1983, for her violations of plaintiff's substantive due process rights including but not limited to actual, compensatory, emotional and punitive damages to be determined by a Jury;

4.    For an award representing actual damages against the District for its discrimination against plaintiff under ADA to be determined by a Jury;

5.    For an award representing punitive damages against the District for its discrimination and against Plaintiff under ADA to be determined by a Jury;

6.    For an award representing compensatory/emotional damages against the District for its discrimination against plaintiff under ADA to be determined by a Jury;

7.    For an award representing actual damages against the District for its disability discrimination against plaintiff under NYEL§ 290 *et seq*, to be determined by a Jury.

8.    For an award representing compensatory/emotional damages against the District for its Disability discrimination against plaintiff under NYEL § 290 *et seq*, to be determined by a Jury.

9.    For an award representing actual damages against Gierasch for her disability discrimination against plaintiff under NYEL § 290 *et seq*, to be determined by a Jury.

10.    For an award representing compensatory/emotional damages against Gierasch for her disability discrimination against plaintiff under NYEL § 290 *et seq* to be determined by a Jury.

11.    For an award representing actual damages against Devine for her disability discrimination against plaintiff under NYEL § 290 *et seq* to be determined by a Jury.

12.    For an award representing compensatory/emotional damages against Devine for her disability discrimination against plaintiff under NYEL § 290 *et seq* to be determined by a Jury.

13.    For an award representing actual damages against Solomon for his disability discrimination against plaintiff under NYEL § 290 *et seq* to be determined by a Jury.

14. For an award representing compensatory/emotional damages against Solomon for his

Disability discrimination against plaintiff under NYEL § 290 *et seq* to be determined by a Jury.

15. For reasonable attorney's fees and costs;

16. For equitable relief; and

For such further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all issues in this action.

Dated: Islandia, New York
June 26, 2020

SCOTT MICHAEL MISHKIN, P.C.
By: _____
    Scott Michael Mishkin, Esq.
    One Suffolk Square, Suite 240
    Islandia, New York 11749
    Tel: (631) 234-1154
    Fax: (631) 234-5048
    *Attorneys for Plaintiff*